UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                        **REPORT AND**
                                                 **RECOMMENDATION**
v.
                                                 13-CR-00226-WMS-JJM
YI LIU,
                              Defendant.
_____

This case was referred to me by Hon. William M. Skretny for supervision of all

pretrial proceedings [7].[1]  The seven-count Indictment [6] centers on defendant Yi Liu's alleged

disclosure of trade secrets belonging to his former employer Sprung-brett RDI ("Sprung-brett").

Before me is Liu's motion to suppress the written statement he made following his arrest on

October 10, 2013.  Liu's Pre-Trial Motion  [51], pp. 29-30.[2]

An evidentiary hearing was held on January 8 and 29, 2015 [100, 101], at which

FBI Special Agents ("SAs") Victor Valenzuela and Brandon Miller and FBI forensic accountant

Stephanie Bifano testified on behalf of the government, and Liu testified on his own behalf.

Thereafter, the parties submitted post-hearing briefs [114, 117, 120], and oral argument was held

on June 8, 2015 [121].  For the following reasons, I recommend that the motion be denied.


### BACKGROUND

Liu, a non-native English speaker, seeks to suppress his October 10, 2013 written

statement primarily on grounds that "it was obtained without adequate efforts to insure that he

_____

[1]        Bracketed references are to CM/ECF docket entries.

[2]        The other portions of Liu's pretrial motions are addressed in the accompanying Report,
Recommendation and Order.

understood, and knowingly and voluntarily waived his *Miranda* rights". Liu's Post-Hearing Memorandum of Law [117], p. 1. At the evidentiary conducted on this issue, SA Valenzuela testified that on October 10, 2013, approximately ten FBI agents surrounded Liu's house and rang the doorbell of the front door. January 8, 2015 hearing transcript [100], pp. 6-7, 51-52. When Liu answered the door, SA Valenzuela identified himself as being with the FBI and stated that he had an arrest warrant and search warrants (id., pp. 9-10, 52). SA Valenzuela did not tell Liu what the warrant was for, but when Liu later asked what the investigation was about, he told him that it had to do with stolen property while he was employed at Gamesa, his employer after he left Sprung-brett, but did not mention trade secrets or Sprung-brett until they arrived at the FBI's office (id., pp. 52, 70-71).

The agents had Liu step outside for approximately five minutes while the house was secured (id., pp. 7, 9, 54). SA Valenzuela testified that Liu was compliant with their requests (id., p. 53). After the house was secured, Liu was brought back into the house, where SA Valenzuela told Liu, "I'd like to . . . straighten out this issue and ask him some questions, but before I could ask him questions I needed to advise him of his rights" (id., pp. 11-12, 55, 61 ("I . . . stated that . . . I could not ask him any questions without going over those rights. I stated I did like to hear his side of the story, if he was willing to discuss the matter")). While SA Valenzuela acknowledged that he had not commenced other interviews by stating that he would just "like to straighten things out" (id., p. 56), he explained that Liu appeared to be "surprised and perhaps a little bit fearful of what[ ] [was] going on. So I wanted to advise him that we were law enforcement and that . . . it would straighten itself out after we secured the house" (id., p. 57).

Liu was offered both English (gov. ex. 3A [127-1]) and Chinese (gov. ex. 3B [127-2]) versions of the FD-395 Advice of Rights form.  Hearing transcript [100], pp. 12, 57. Liu responded, "'no, I understand English'", and  SA Valenzuela proceeded to advise Liu of his rights using the English version of the form (id., p. 12). The first line of the Advice of Rights form states, "Before we ask you any questions, you must understand your rights", and is then followed by six lines of rights. Gov. ex. 3A [127-1].  That section of the Form is followed by a "Consent" section, which states "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present", and is followed by a signature line (id.).

SA Valenzuela testified that Liu "held [the Advice of Rights form] up . . . and was reading it and I then from my copy read it verbatim, the six or seven lines on the 395"  (id, pp. 12-13, 58).  He read the first seven lines of the form to Liu "[p]erhaps a little bit quicker" than he did during the hearing (id., p. 15).

SA Valenzuela knew that Liu was not a native English speaker and had a Chinese linguist available on standby at the staging area approximately one to two miles away, but it did not appear to him that Liu was unable to understand what he was reading to him.  Hearing transcript [100], pp. 15, 62, 73. Liu never interjected or said anything to the effect that he did not understand what was being read to him (id., p. 15).   However, SA Valenzuela did not advise him that a Chinese linguist was available (id., p. 73).

When asked what he did after reading the first seven lines of the Advice of Rights form, SA Valenzuela first testified, "I advised . . . Liu if you understand these and are willing to answer any questions at this time - -" (id., p. 14).  However, when the question was repeated, SA

Valenzuela testified, "I advised . . . Liu if he would like to answer questions from us, the FBI, to sign where it says 'signed.' Something to that effect" (id., pp. 14, 63). Liu signed the waiver (id., p. 14). SA Valenzuela acknowledged that he did nothing apart from reading from the Advice of Rights form to ensure that Liu understood his rights and that he was waiving those rights (id., p. 68). He did not ask Liu if he wanted to waive or give up his rights (id., p. 69). SA Valenzuela also did not tell Liu that in order for them to talk to him that he would have to give up his rights (id.). Nor did he explain to Liu what the right to remain silent meant (id., p. 62).

After Liu was Mirandized, he was given time to get dressed and speak briefly with his wife and child (id., p. 16). During his exchange with his wife, he spoke "primarily" in Chinese, but SA Valenzuela heard "English mixed in the Chinese", including the phrase "stolen property", which he repeated a couple of times (id., p. 16). Liu was then handcuffed and escorted outside to SA Valenzuela's vehicle (id., pp. 16-17). Before reaching the vehicle Liu greeted a passing neighbor in English (id., p. 17). Three agents entered the vehicle with Liu and he was driven approximately 30 minutes to the FBI's office (id., pp. 17-18). SA Valenzuela testified that he made small talk with Liu (id., p. 18).

At the FBI's office, Liu was questioned for approximately three and a half hours by SAs Valenzuela and Miller (id, pp. 19-20). SA Valenzuela testified that Liu's answers were appropriate to the questions asked and that Liu asked questions (id., p. 20). He acknowledged that "[a]t times . . . it was challenging to understand certain things that [Liu] did say" and "[t]here were times that perhaps I had to repeat something or Mr. Liu had to repeat something, but there wasn't a time that I remember where we did not understand each other within one or two tries speaking in English" (id., pp. 20, 62). However, difficulties in understanding Liu's reference to a

part of a wind turbine and identification of his family members resulted in SA Valenzuela having Liu write this information (id., pp. 21-23; gov. ex 5 [127-4]).

After the interview concluded, SA Valenzuela spent approximately one hour memorializing the interview in a handwritten statement. Hearing transcript [100], pp. 20-21. While SA Valenzuela was preparing the statement, Liu was eating lunch, but occasionally SA Valenzuela would "ask [Liu] a question or two to confirm something" (id., pp. 21, 77).

SA Valenzuela testified that he intentionally placed errors in the written statement (gov. ex. 4 [127-3]) to determine if Liu read and understood it. Hearing transcript [100], pp. 24, 81-82. When Liu read the statement, he corrected the errors, added some things to the statement, and initialed each paragraph to indicate that he understood it (id., pp. 24-28, 82-83, 92).

SA Valenzuela could not recall why he left a blank section on page five of the statement, which Liu filled in with an apology (id., pp. 83-84; gov. ex. 4 [127-3], p. 5 of 5). However, he denied suggesting that Liu write the apology (id., p. 84).

It took approximately five hours from the commencement of the interview to the completion of the statement (id., p. 29). No promises or threats were made to Liu (id., pp. 30-31). At no point did Liu request the questioning to cease or request a lawyer (id., p. 31).

SA Valenzuela testified that he was present at Liu's December 16, 2013 immigration hearing (id., pp. 32-35). During that proceeding, the immigration judge stated that Liu had indicated off the record that he spoke English, his attorney also indicated that he believed that Liu could understand the proceeding, and Liu confirmed to the judge at the conclusion of the proceeding that he understood the proceeding. Gov. ex. 6T [127-5], pp. 1, 2, 8. However, Liu requested a translator for the next proceeding. Hearing transcript [100], pp. 88-89.

SA Miller testified that when SA Valenzuela informed Liu that they were with the FBI and had a warrant for his arrest and to search his home, Liu "seemed a little confused as to why we were there" (id., pp. 99, 111-12). Although SA Miller knew that Liu was not a native English speaker, he did not attribute his confusion to the possibility that he may not have understood what was being told to him (id., p. 112).

SA Valenzuela offered Liu both English and Chinese versions of the FD-395 Advice of Rights form (id., pp. 99-100). SA Miller testified that Liu indicated that "the English version would be fine", and that SA Valenzuela "explained this is a standard form that we use, this is explaining what his rights are, and his right to waive those rights, and that by reading the form and telling him this is voluntary, at any time you can say you don't want to talk to us, and you don't have to talk to us" (id., pp. 100, 113). "After explaining what the form was, [SA] Valenzuela read the top portion of the form out loud to . . . Liu. And then there is a bolded line that says 'consent' with a couple of sentences, that he asked . . . Liu to read out loud, which he did, and then sign and date the form, which he did" (id., pp. 100, 115). Liu and SA Valenzuela read from the same copy of the Advice of Rights form (id., p. 101). SA Miller conceded that the FD-302 summary of the interview prepared by he and SA Valenzuela did not indicate that Liu was orally advised of his rights or that he was instructed to read a portion of the form aloud (id., pp. 116-17).

SA Miller testified that the term "waive" was not explained to Liu and that there was nothing in the Advice of Rights form to inform the reader that by signing it, the individual was waiving his rights (id., pp. 113-14). However, he testified that SA Valenzuela made it clear in explaining the form to Liu that by signing the form, he would be waiving his rights (id., p.

114). Liu gave no indication that he had trouble understanding, but SA Miller acknowledged that it was not Liu's responsibility to make sure that he understood his rights (id., pp. 101, 112, 114-15). He further conceded that there was no evidence, other than the Advice of Rights form, to indicate that Liu understood his rights (id., p. 117).

SA Miller testified that during the 30 minute trip to the FBI's office, the agents engaged in small talk with Liu and there was nothing that Liu said that he was unable to understand or required repeating (id., pp. 103-04). SA Miller testified that Liu's responses during the interview were appropriate to the questions asked and at no point did Liu indicate that he did not understand their questions (id., pp. 104-05). SA Miller testified that Liu appeared cooperative and to be answering their questions voluntarily (id., p. 108). No threats or promises were made to Liu (id., pp. 108-09).

Following the approximately four hour interview, SA Valenzuela prepared a written statement, which Liu reviewed "paragraph-by-paragraph, initially each paragraph that was correct and making corrections as needed" (id., p. 105). SA Valenzuela advised Liu that "by him initially each paragraph, it meant that he read the paragraph, he understood what it meant and that what the paragraph said was accurate" (id., p. 106). Liu located and corrected the errors intentionally placed in the statement by SA Valenzuela (id., pp. 106-07).

SA Miller testified that SA Valenzuela "emphasized to . . . Liu that this was his opportunity to tell his side of the story. . . . And also if there was anything he wanted to add to the statement, that he needed to include that", and that Liu took him up on that offer by adding to the statement after it was given to him by SA Valenzuela (id., pp. 107-08, 118-19). SA Miller did not know why SA Valenzuela left a gap in the middle of the last page of the statement, where

Liu later wrote his apology  (id., p. 119). However, he testified that it was suggested to Liu that it would be a good place for him to apologize for what he had done (id., p. 121).  SA Miller did not recall whether Liu was informed after reviewing the statement that he did not have to sign it (id., p. 119).

Stephanie Bifano testified that among the documents that she observed during the search of  Liu's home was a guide on how to conduct telephonic interviews and English to Spanish translation exercises (id., p. 124). She testified that both documents contained handwriting in English that appeared to be similar to Liu's (id., pp. 126-27, 130).

Defendant Liu testified, with the use an interpreter, that he first studied English when he was 12 years old as a student in China (id., p. 133). These studies focused primarily on reading English (id., pp. 133-34). He also took English reading, vocabulary and grammar courses at the University of Science and Technology in Beijing (id., p. 134; gov. ex. 7B [127-7]).  As a graduate  mechanical engineering student at the Zhengzhou Research Institute, Liu took courses that focused only on "mechanical English". Hearing transcript [100], p. 135; gov. ex. 7A [127-6]. English was spoken during classes in graduate school, but after class everyone spoke Mandarin Chinese.  Hearing transcript [100], p. 135.  Liu's master's thesis was in Chinese (id.).

To attend school in North America he took the Graduate Record Examination ("GRE") in English, but his scores were not good enough to get into a United States graduate school (id., pp. 136-7; def. ex. 2 [127-19]).  However, Canadian graduate schools did not require the GRE (id., p. 137).  Instead, they required the Test of English as a Foreign Language ("TOEFL"), which he took in 1999.  Hearing transcript [100],  pp. 137-38; def. ex. 1 [127-18].

While obtaining his Ph.D at the University of Waterloo in Canada, Liu took English classes to improve his written English. Hearing transcript [100], pp. 138 39; gov. ex. 7C [127-8]. Liu testified that his classes at the University of Waterloo were conducted in English, which was "[v]ery difficult" for him. Hearing transcript [100], p. 139. He would have others "polish" his assignments which were written in English, including his 153 page Ph.D dissertation entitled "Automated Type and Dimensional Synthesis of Planar Mechanisms Using Numeric Optimization with Genetic Algorithms" (gov. ex. 11 [127-12 - 127-15]), which he first wrote in Chinese before translating it to English. Hearing transcript [100], pp. 139-42. Liu testified that he spent four months preparing to defend his dissertation in English (id., p. 147). Apart from his school books, he did not read any books in English and did not attend any English language movies (id., p. 140). Liu testified that he would primarily communicate with other students by e-mail and that if he had to verbally communicate in English, he would practice before speaking (id., p. 141). Liu continues to have a problem with listening comprehension (id., p. 141).

Liu retained a career counselor to help him write his resume (gov. ex. 8 [127-9]) in 2005. Hearing transcript [100], p. 133. His first employment after he graduated from the University of Waterloo was with Sprung-brett (id., pp. 146-47). Liu, who did not have a Chinese speaking colleague at Sprung-brett, testified that he had some difficulty communicating with his co-workers (id., pp. 147-48). However, he communicated primarily by e-mail using "technical English" (id., pp. 148-49). Liu testified that communicating by e-mail "give me time and space which allow me to look into some difficulty in the language" (id., p. 149). He also relied upon translation programs (id., pp. 149-50). While working at Gamesa, Liu experienced

similar difficulties communicating with his colleagues, who were primarily English or Spanish speaking (id., p. 149).  He testified that it was "[v]ery unusual" for him to socialize with his colleagues at Gamesa in English (id., p. 150).  The English to Spanish translation materials that were located in his home were from a Spanish training program provided by his employer in 2011 and he had retained the materials for his daughter (id., p. 151).

Liu testified that he sometimes has problems with "difficult vocabularies" (*i.e.*, words with different meanings).  January 29, 2015 hearing transcript [101], p. 7.  He also testified that he had difficulty with the speed at which English speakers spoke (id., pp. 7-8).

Liu  testified that English was not spoken in his home and that he did not watch Canadian or American television (id., p. 10).  However, the government introduced a home video taken on April 27, 2013 (gov. ex. 26) in which his entire conversation with his daughter was in English. Hearing transcript [101],  pp. 64-67.  When asked why he was not speaking Chinese, he explained "[a]t that time I knew that I was going to be laid off from my job.  I knew that I had to practice my English" (id., p. 66).   He also explained that his daughter preferred him to speak English in public (id., p. 95).

Liu testified  that he was not familiar with <u>Miranda</u> rights (id., pp. 11-12).  He was "just in shock" at the time of his arrest (id., p. 13).  While he was told by the agents that they had a warrant, he did not know what a warrant meant (id., p. 14).

Liu testified that SA Valenzuela did not explain the Advice of Rights form to him and told him that he "need[ed] to sign" it, "so I didn't read the form carefully,  but I signed it" (id., pp. 18, 33).  He later testified that he did not read the form (id., pp. 36, 78-79).  When confronted with this inconsistency on cross-examination, he testified "I only saw the name of the

form. That's it" (id., p. 74). However, Liu acknowledged that he had time to read the form (id., p. 78).

Liu testified that he was not provided with the Advice of Rights form written in Chinese, but was advised by SA Valenzuela that he had one (id., pp. 26, 37). Liu explained that he did not request the Chinese version of the form, since his understanding was that he had to sign the form regardless of whether it was in English or Chinese (id., p. 37). Liu believed that "anybody who has been investigated by the FBI need[s] to sign this form" (id., pp. 18-19). He explained his belief that "the form was meant to be helping . . . the FBI agent's job. It's not for myself. This isn't like -- it's like a FedEx come to my house and deliver package to me. I have to sign that form" (id., p. 36). However, had he been given both versions of the Advice of Rights form, he would have selected the Chinese version (id., p. 38). He also understood the term "advice" to mean a suggestion (id., p. 35).

Liu testified that he remembered being advised of his right to remain silent, but did not "understand clearly" the rest of what he was told because SA Valenzuela "spoke very fast" (id., pp. 21, 76-77, 99). Prior to his arrest, he had never heard of the right to remain silent and did not know of his right not to answer police questioning (id., p. 22). There are multiple Chinese words that correspond to the words "right" and "silent" (id., pp. 23, 31; def. exs. 8 and 9 [127-20, 127-21]). Liu believed that the right to remain silent meant, "I shouldn't interrupt . . . . I shouldn't scream or yell at police or the FBI"; he did not believe that it had anything to do with questioning by the FBI. Hearing transcript [101], p. 33. Liu acknowledged that in January 2011, when his brother was in trouble with authorities in China for videotaping and posting on the

internet videos of police mistreatment, he drafted an email stating "I may need a lawyer who can really fight against the Pulic [*sic*] Security Bureau" (id., pp. 70-72, 97-98; gov. ex. 21 [121-17]).

Liu testified that SA Valenzuela did not ask him if he understood his rights before he signed the form and did not have him read aloud from the form. Hearing transcript [101], pp. 33-34. When he arrived at the FBI's office, he continued to not understand that he could stop the questioning by simply telling the agents that he did not want to answer their questions (id., p. 45). He also testified that he did not understand the connection between the Advice of Rights form he executed at his house and the questioning that was occurring at the FBI's office (id., pp. 47, 100). Liu further testified that he did not understand that he did not have to sign the statement (id., pp. 47-48).

To demonstrate Liu's difficulty with spoken English, he was asked to read a paragraph from his resume. Hearing Transcript [100], pp. 132-33. According to his counsel, he did so at only a 52.3% accuracy rate. *See* Liu's Post-Hearing Memorandum [117], pp. 3-4.

## ANALYSIS

Liu seeks to suppress his October 10, 2013 statement on three grounds. First, he argues that "it was obtained without adequate efforts to insure that he understood, and knowingly and voluntarily waived his *Miranda* rights". Liu's Post-Hearing Memorandum of Law [117], p. 1. Second, he argues that his "'rights' were not revisited" despite there being a "significant

break" before questioning (id., p. 12).[3]  Lastly, he argues that his statements were the fruit of an

unlawful arrest (id., pp. 23-27).


**A.      Was Liu's Waiver of his <u>Miranda</u> Rights, Knowing, Voluntary and Intelligent?**

The parties agree that the government bears the burden of establishing by a

preponderance of the evidence that Liu's <u>Miranda</u> waiver was voluntary, knowing and intelligent.

Government's Post-Hearing Memorandum of Law [114], p. 10; Liu's Post-Hearing

Memorandum of Law [117], p. 16.   "To prove a valid waiver, the government must show (1)

that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a

full awareness of the right being waived and of the consequences of waiving that right." <u>United</u>

<u>States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995).   "Only if the totality of the circumstances

'reveals both an uncoerced choice and the requisite level of comprehension may a court properly

conclude that the <u>Miranda</u> rights have been waived.'" <u>United States v. Male Juvenile</u>,  121 F.3d

34, 40 (2d Cir. 1997) (*quoting* <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

---

[3]       In his initial motion to suppress statements, Liu argued in passing that "[t]he agents . . . failed to contact the Canadian Embassy or Consulate before interrogating [him], in violation of the Vienna Convention".  Liu's Pretrial Motion [51], p. 30.  However, that issue was neither raised in Liu's Affidavit [68] in support of suppression nor the subject of the suppression hearing.  In any event, it is meritless since "the consular-notification provision of the Vienna Convention and its related regulations do not create any 'fundamental rights' for a foreign national". <u>United States v. De La Pava</u>,  268 F.3d 157, 165 (2d Cir. 2001). *See* <u>United States v. Page</u>,  232 F.3d 536, 540 (6th Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 935 (2001) ("[T]here is no right in a criminal prosecution to have evidence excluded . . . due to a violation of [the Vienna Convention]"); <u>United States v. Nai Fook Li</u>, 206 F.3d 56, 60 (1st Cir.) (en banc), <u>cert</u>. <u>denied</u>, 531 U.S. 956 (2000) ("[I]rrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment").

Although a signed <u>Miranda</u> waiver "is usually strong proof of the validity of that waiver . . . . [,] [t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the <u>Miranda</u> case". <u>North Carolina v. Butler,</u> 441 U.S. 369, 373 (1979). "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." <u>United States v. Spencer,</u> 995 F.2d 10, 11-12 (2d Cir.), <u>cert</u>. <u>denied</u>, 510 U.S. 923 (1993).

In arguing that he did not knowingly, intelligently and voluntarily waive his <u>Miranda</u> rights, Liu points to the fact that he was "a non-native speaker of English with limited skills in comprehending normally spoken English" (Liu's Post-Hearing Memorandum of Law [117], p. 6); that the mandates of his Chinese culture rendered him "'inclined . . . to surrender instinctively his *Miranda* rights'" (<u>id</u>., p. 18); that he was unfamiliar with the American legal system (<u>id</u>., pp. 17-18); and that he received only a "[s]uperficial advice of rights", notwithstanding that the agents had a "greater duty" in advising a non-native speaker of his <u>Miranda</u> rights (<u>id</u>., pp. 7-9, 19-22). I will address each of these factors individually.

### 1.     Proficiency with English

While Liu relies heavily on the fact that he was a non-native English speaker with limited proficiency, "[i]t is well-settled that the existence of limitations on language skills does not necessarily bar a finding of a knowing and voluntary waiver." <u>United States v. Richardson</u>, 2010 WL 5437206, *4 (E.D.N.Y. 2010). "[T]he quintessential question is whether the government has proved by a preponderance of the evidence from the totality of the circumstances that [a defendant] had a command of English sufficient to find that he understood his <u>Miranda</u>

rights and the consequences of his waiver." United States v. Ibrahim, 998 F.Supp.2d 12, 17 (N.D.N.Y. 2014).

Resolution of this issue (as with others) turns largely on the credibility of the witnesses. *See* United States v. Bayless, 921 F.Supp. 211, 213 (S.D.N.Y.1996). "It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the judge is entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness." Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012).

Having observed the demeanor of the witnesses, and after carefully considering their testimony and the evidence, I give little weight to Liu's self-described lack of proficiency with English and understanding of what he was told by SA Valenzuela at the time of his arrest. Contrary to his testimony, the record strongly evidences that Liu had a sufficient command of the English language to knowingly and voluntarily waive his Miranda rights in English. Far from being a neophyte to the English language, Liu, who was 41 years old at that time of his arrest, had taken courses to learn English since age twelve, lived in Canada and the United States for approximately 12 years, obtained his doctorate at an English speaking University, wrote a lengthy dissertation in English that he also defended in English, and worked as an Engineer at American and Canadian companies for approximately seven years where he communicated with his co-workers in English. Hearing transcript [100], pp. 133-34, 138-39, 147; gov. exs. 7A-7C, 8 [127-6 - 127-9].

Though Liu attempts to cast his use of English as being limited to communicating by e-mail for purposes of his employment, he conceded that in public he spoke to his daughter in

English and that he used some English when talking to his wife at the time of his arrest. Hearing transcript [101], pp. 79, 95. While English was not his primary language, Liu plainly had a sufficient comfort with that language to opt for the English version of the Advice of Rights form, even though SA Valenzuela offered him the use of a Chinese version of the Advice of Rights form. Hearing transcript [101], pp. 26, 37. Nor did Liu ever interject or say anything to the effect that he did not understand the <u>Miranda</u> rights that were read to him (<u>id</u>., p. 15).

Demonstrating his understanding of English, Liu readily found each of the errors placed in the written statement prepared by SA Valenzuela in English (gov. ex. 4 [127-3]) and added text to his statement in English. *See* <u>United States v. Juvenile Male</u>, 968 F.Supp.2d 490, 507 (E.D.N.Y. 2013) (finding that the defendant had a sufficient understanding of English to validly waive his <u>Miranda</u> rights where, *inter alia*, "the detectives testified that the defendant corrected factual mistakes in the English statements"). Further, Liu was extensively interviewed in English, and I credit the agents' testimony that Liu's answers were appropriate to the questions asked during the interview. Hearing transcript [100], pp. 20, 104-05. *See* <u>United States v. Jabu</u>, 2012 WL 5389937, *7 (E.D.N.Y. 2012) (Based in particular on "Mr. Jabu's ability to participate (in English) in extensive and substantive English-only interactions with Agent Soto, the court finds that the preponderance of the evidence establishes that Mr. Jabu's English-language skills were sufficient to enable him to knowingly, voluntarily, and intelligently waive his <u>Miranda</u> rights").

While SA Valenzuela acknowledged that "[a]t times . . . it was challenging to understand certain things that [Liu] did say" and "[t]here were times that perhaps I had to repeat something or . . . Liu had to repeat something", he testified that "there wasn't a time . . . where

we did not understand each other within one or two tries speaking in English".  Hearing

transcript  [100], pp. 20, 62.  Nonetheless, any limitations Liu may have had with his proficiency

with spoken English were not significant enough to prevent him from making a knowing,

intelligent and voluntary waiver of his <u>Miranda</u> rights. *See* <u>Campaneria v. Reid</u>,  891 F.2d 1014,

1020 (2d Cir. 1989) ("Even though his proficiency in the English language may have been

limited, it did not prevent him from making a knowing and intelligent waiver of his

constitutional rights").  Indeed, at his Fed. R. Crim. P. ("Rule") 5 initial appearance in South

Carolina following his arrest, Liu responded "Yes" when asked by Magistrate Judge Shiva V.

Hodges if he understood English. *See* October 10, 2013 transcript [131], p. 2.[4] At that time, he

was advised that he had the "right to remain silent and anything that you say can be used against

you" (<u>id</u>.).  When asked if he understood these rights, he responded "Yes" (<u>id</u>.).[5]  He was also

asked whether he understood the charges against him, and responded "I understand" (<u>id</u>., p. 22).

        Liu attempts to minimize the significance of these acknowledgments by pointing

to the testimony of Professor William Gregory Eggington in <u>United States  v. Al-Saimari</u>, 982

F.Supp.2d 1285, 1288 (D.Utah 2013) to the effect "that many second language learners who have

low proficiency will 'fake comprehension' in conversations, even when they do not understand

what they are hearing".  However, here, no expert testimony was introduced.[6]

---

[4]     I granted the government's motion to take judicial notice of the transcript of the Rule 5 initial appearance in South Carolina on the condition that the entire transcript of that proceeding be docketed.  March 25, 2015 Text Order [113].

[5]     Liu argues that the audio recording of that proceeding establishes that his response was "okay, yes".  Liu's Post-Hearing Memorandum of Law [117], p. 5.  Even if that were so, it does not minimize the significance of the acknowledgment that he understood those rights.

[6]     Although I permitted Liu to address in his post-hearing brief whether consideration of additional evidence is necessary (*see* March 25, 2015 Text Order [113]; April 30, 2015 Text Order

## 2. Chinese Culture

As the government acknowledges, "'[c]ultural heritage clearly has some impact upon an individual's awareness of his or her rights and necessarily assumes a role in the 'totality of the circumstances' analysis,' and clearly this Court must factor the defendant's 'cultural heritage' into its recommended decision". Government's Post-Hearing Reply Memorandum of Law [120], p. 2 (*quoting* <u>Tze Poong Liu v. State</u>, 628 A.2d at 1380-81 (Del. 1993)). Pointing to academic articles and <u>Tze Poong Liu</u>, Liu argues that the mandates of his culture rendered him submissive to any law enforcement requests. Liu's Post-Hearing Memorandum of Law [117], p. 118. However, unlike in <u>Tze Poong Liu</u>, in this case there was no expert testimony that Liu's <u>Miranda</u> waiver or other conduct was compelled by his Chinese heritage.

Moreover, Liu's correction of errors in his written statement evidences that he was not entirely submissive to the agents. Likewise, when his brother was in trouble in China for videotaping police mistreatment and posting it on the internet, he attempted to get an attorney to "really fight against" the Public Security Bureau - conduct inconsistent with an individual that would "'follow whatever - instruction - a law officer would require'" or not understand the need for counsel. Liu's Post-Hearing Memorandum of Law [117], p. 118; hearing transcript [101], pp. 97-98; gov. ex. 21 [127-17].

## 3. Familiarity with the American Legal System

"The fact that [a defendant] might not be familiar with the United States' form of justice is merely one factor to be considered" in determining whether a <u>Miranda</u> waiver is

---

[116]), he does not argue that additional evidence is necessary for resolution of the motion.

knowing and voluntary.  United States v. Labrada-Bustamante,  428 F.3d 1252, 1259 (9th Cir.

2005).  Here, Liu's argument that he was unfamiliar with the American legal system is

unpersuasive.  As the government argues, it is difficult to reconcile that Liu "knew that he should

get a lawyer for his brother, who was in trouble thousands of miles away in another country

but . . . did not realize or know that having a lawyer when he himself was in trouble might be

beneficial".  Government's Post-Hearing Memorandum of Law [114], p. 10.  In any event, "the

inquiry as to whether a defendant understood the recitation of the Fifth Amendment rights

focuses not on the defendant's understanding of the U.S. criminal justice system, the democratic

form of government, and/or the concept of individual rights, but rather on whether the defendant

could, merely as a linguistic matter, comprehend the words spoken to him".  United States  v.

Hasan,  747 F.Supp.2d 642, 670-71 (E.D.Va. 2010), aff'd  680 F.3d 446 (4th Cir. 2012), cert.

denied,  133 S.Ct. 982 (2013) (citing cases).


    **4.**        **Superficial Advice of Rights**

       Liu argues that he received only a "[s]uperficial advice of rights", since SA

Valenzuela testified that before advising Liu of his Miranda Rights, he told Liu, "I'd like to . . .

straighten out this issue and ask him some questions, but before I could ask him questions needed

to advise him of his rights".  Hearing transcript [100], pp. 11-12, 55.

       Liu argues that  SA Valenzuela's initial statement to him that he wanted to

"straighten this out" is "the type of thing said to put the arrestee at ease, and to encourage them to

speak as thou giving their side of the story might result in terminating the arrest, with everyone

going home". Liu's Post-Hearing Memorandum of Law [117], pp. 7-8.  However, "[w]ithout

more, statements urging petitioner to tell his story and indicating that doing so was to his benefit do not amount to coercive conduct". Reese v. Sullivan, 2012 WL 781754, *13 (C.D.Cal. 2012), adopted, 2012 WL 777317 (C.D. Cal. 2012). Nor was there any testimony by Liu that SA Valenzuela's statement that he wanted to "straighten this out" compelled him to speak. In fact, when asked if he thought he "would just go straighten things out with the FBI", he responded, "at that time I really didn't know why I have to talk to them with the things they were trying to discuss". Hearing transcript [101], p. 80.

Liu also argues that the second part of SA Valenzuela's statement "obscur[ed] the true fact that it was . . . something. . . [he] needed to do - give up his rights - before questions could be asked". Liu's Post-Hearing Memorandum of Law [117], p. 8 (emphasis omitted). Likewise, Liu points to SA Valenzuela's testimony that after reading Liu his Miranda rights he merely asked "if he would like to answer questions from us, the FBI, to sign" the form, acknowledging that he never asked him if he was willing to waive his rights. Hearing transcript [100], pp. 14, 29.[7]

However, Liu acknowledges that he was given the Advice of Rights form and had an opportunity to read it. Hearing transcript [101], pp. 75, 78. As the government notes (government's Post-Hearing Memorandum of Law [114], p. 2), the Advice of Rights form states: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Gov. ex. 3A [127-1]. While at points Liu

---

[7]     I agree with Liu that SA Miller's testimony of what SA Valenzuela advised Liu before reading the Advice of Rights form (hearing transcript [100], pp. 100, 113) and testimony that Liu read the consent section of the Advice of Rights form aloud (id., pp. 100, 115) is questionable given the contrary testimony of both Liu and SA Valenzuela. Liu's Post-Hearing Memorandum of Law [117], pp. 8-9.

testified that he did not read the Advice of Rights form (hearing transcript [101] pp. 36, 78-79), it is undisputed that he read, initialed and signed his October 10, 2013 written statement, wherein he stated , "I have been given a form entitled, 'Advice of Rights' by SA Valenzuela, which *I have read, understood* and signed". Gov. ex. 4 [127-3] (emphasis added).  Therefore, I do not credit his testimony that he failed to read the Advice of Rights form or understand its contents.

Liu's reliance on United States v. Al-Saimari, 982 F.Supp.2d 1285 (D.Utah 2013) does not compel a different result.  Liu's Memorandum of Law [117], pp. 19-21. Critical to the court's determination that the government had not met its burden of establishing a knowingly and voluntary Miranda waiver, the court in Al-Saimari noted that the defendant did not respond when asked if he understood his rights. Id. at 1290.  When asked "'[h]aving these rights in mind, do you wish to talk to me today about what's going on?'", the defendant responded,  "'I don't know, you know. I'm just surprised, you know'". Id.

Here, by contrast, here, not only did Liu sign a Miranda waiver stating that he understood  his Miranda rights and was willing to answer questions without a lawyer present, later that day he signed and initialed a written statement that stated that he read and understood the Advice of Rights form.  Moreover, "Miranda does not require the interrogator to ask the suspect whether the latter understood each of the rights, although it is doubtless good police practice to do this when the circumstances permit." United States v. Hall, 724 F.2d 1055, 1059 (2d Cir. 1983). *See* United States v. Swinger,  2009 WL 311870, *4  (D.Vt. 2009) ("Takats argues the officers did not ask him whether he understood his rights, however, Miranda does not require an interrogator to make such an inquiry").

Liu further argues that a greater duty is imposed on law enforcement in advising non-native speakers of their <u>Miranda</u> rights. Liu's Post-Hearing Memorandum of Law [117], pp. 19-22.  However, given Liu's proficiency with the English language, I conclude that the warnings provided to him in this case were sufficient for a knowing and voluntary waiver.

### 5.     Totality of the Circumstances

Based on the totality of the circumstances, I conclude that the United States has satisfied its burden of demonstrating that Liu knowingly, intelligently and voluntarily waived his <u>Miranda</u> rights by a preponderance of the evidence.  Therefore, I recommend that this portion of Liu's motion be denied.

### B.     Were the Agents Required to "Re-Visit" Liu's <u>Miranda</u> Rights Before his Interview?

There is no set requirement for "renewed <u>Miranda</u> warnings for a defendant in continuous custody after a period of time has passed".  <u>Cooper v. Graham</u>,  2011 WL 5597356, *4 (W.D.N.Y. 2011) (Telesca, J.).  Renewed warnings are not required "unless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights." <u>Wyrick v. Fields</u>, 459 U.S. 42, 47 (1982).

The approximately 30 minute interval between Liu being administered his <u>Miranda</u> rights and the commencement of his interview, during which little changed other than Liu's location, did not require him to be re-Mirandized.  *See*  <u>United States ex rel. Patton v.</u>

Thieret, 791 F.2d 543, 548 (7th Cir.), cert. denied, 479 U.S. 888 (1986) (an approximately 40

minute interval between the defendant being Mirandized and questioned did not require that his

Miranda rights be given again); Cooper, 2011 WL 5597356, *4 ("The state courts were correct in

determining that Cooper's waiver of his Miranda rights was not rendered invalid by virtue of the

approximately 13 hours which elapsed between the waiver and his making the statements").[8]

Therefore, I recommend that this portion of Liu's motion be denied.


**C.    Were Liu's Statements the Fruit of an Unlawful Arrest?**

Although this argument was not the subject of the suppression hearing and first

raised by Liu in his post-hearing submission [117], the government agreed at the June 8, 2015

oral argument that it may be considered.  In support of this motion, Liu relies upon his arguments

in support of his motion to suppress the evidence seized pursuant to the search warrants issued in

this case for lack of probable cause.  *See* Liu's Post-Hearing Memorandum of Law [117], pp. 22-

23 ("Just as we have argued that there was no probable cause justifying the issuance of the search

warrants in this case, there was, *for the very same reason*, no probable cause for issuance of the

arrest warrant" (emphasis added)).

---

[8]    Liu notes that SA Valenzuela suggested to him that he make an apology and left a space in the statement for that purpose.  Liu's Post-Hearing Memorandum of Law [117], p. 12. However, Liu has only sought suppression of  his statement on the grounds that it "was obtained without adequate efforts to insure that he understood, and knowingly and voluntarily waived his Miranda rights" (id. at p. 1), not on the grounds that the statement itself was involuntarily given. *See* Cruz v. Brazelton, 2015 WL 1738435, *3 n. 4  (N.D.Cal. 2015) ("[T]he voluntariness of a confession is a separate legal issue from the voluntariness of a Miranda waiver").  Therefore, except to the extent that it may bear upon the witnesses' credibility, this conduct, which occurred after his Miranda waiver, is irrelevant.

Since SA Valenzuela's September 30, 2013 Affidavit submitted in support of the search warrants for Liu's home, person, and place of employment [123] is substantially similar to the September 24, 2013 Affidavit he submitted in support of the Criminal Complaint [1], for the reasons set forth in my accompanying Report, Recommendation and Order denying Liu's motion to suppress the evidence seized pursuant to the search warrants,  I likewise recommend that this portion of Liu's motion be denied.


## CONCLUSION

For these reasons, I recommend that Liu's motion to suppress his statements (Liu's Pre-Trial Motion [51], pp. 29-30) be denied.

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by September 8, 2015 (applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests for extension of this deadline must be made to Judge Skretny.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of

the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection

Dated: August 20, 2015

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge